**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re**   **Maria Louisa Sage,** | : | Chapter 7 |
| | : | |
| Debtor. | : | Bky. No. 21-11708 (PMM) |

| | | |
|---|---|---|
| **Karl Tepes,** | : | |
| | : | |
| Plaintiff | : | Adv. No. 21-0076 (PMM) |
| | : | |
| v. | : | |
| | : | |
| **Maria Louisa Sage,** | : | |
| | : | |
| Defendant. | : | |

# O P I N I O N

## I. INTRODUCTION

On Christmas morning, 2019, Maria Louisa Sage (the "Debtor")'s Siberian husky escaped from her property and proceeded to attack Karl Tepes (the "Plaintiff" or "Tepes")'s two (2) Yorkshire terriers, maiming one and killing the other. Following a state court criminal proceeding, the Debtor was found guilty of two (2) counts under Pennsylvania law -unlawful confinement and control and harboring a dangerous dog. The parties then entered into a settlement agreement pursuant to which (in exchange for a reduction in charges) the Debtor confessed judgment owed to the Plaintiff in the amount of $11,621.75 (the "Judgment"). Soon thereafter, the Debtor filed for chapter 7 bankruptcy protection seeking to discharge, *inter alia*, the Judgment.

The Plaintiff, asserting that the amount owed is restitution that was incurred maliciously, protests and seeks to have the Judgment declared nondischargeable. Specifically, two (2) causes

1

of action remain at issue. Count II of this Adversary Proceeding - the only surviving cause of action stated in the Complaint - seeks a determination of nondischargeability pursuant to 11 U.S.C. §523(a)(6).[1] The Plaintiff, however, also purports to state a cause of action pursuant to 11 U.S.C. §523(a)(7), despite the fact that this allegation was not pled in the Complaint.[2]

Trial was held and concluded on March 16, 2022. The Debtor and Tepes testified; no other witnesses were called.

As discussed below, after considering the unusual procedural posture of this matter, the relevant law, and the facts presented, I conclude that the Plaintiff has not adequately plead a cause of action pursuant to §523(a)(7) and that Tepes has failed to meet his burden with regard to §523(a)(6).

Therefore, judgment will be entered for the Debtor.

## II. FINDINGS OF FACT

Based on the credibility of the trial witnesses and the plausibility of their testimony and upon review of the relevant evidence, I make the following findings of fact.

### Background

1. The Debtor resides at 5017 Washington Ave. in Whitehall, PA.

---

[1] The Complaint originally also sought relief pursuant to 11 U.S.C. §523(a)(2)(A) and 11 U.S.C. §523(a)(13). However, following trial, these counts were both dismissed by Order (the §523(a)(2)(A) count upon oral Motion of the Debtor and the §523(a)(13) count upon the consent of the Plaintiff). See doc. #15.

[2] In fact, the absence of a §523(a)(7) cause of action in the Complaint was recognized and discussed at the pre-trial hearing, held on February 9, 2022. It is unclear why the Plaintiff did not seek to amend the Complaint accordingly.

2. The Debtor and the Plaintiff are neighbors and live on different streets about half a mile from each other. Tr. at 38.

3. Robert Blum ("Mr. Blum") was the Debtor's partner at the time of the incident and witnessed the dog attack.[3] Ex. P-1.

4. At the time of the incident in question, neither the Plaintiff's nor the Debtor's yard was enclosed by a fence. Tr. at 39.

5. The Debtor owns an adult brown and white female Siberian husky named Fury ("Fury"). Schedule A/B; Ex. P-5; Tr. at 26.

6. Fury is seven (7) years-old; the Debtor has owned Fury since the dog was a puppy. Tr. at 27.

### The Dog Attack and Aftermath

7. On December 25, 2019, Fury escaped the Debtor's home by "charg[ing]" through the Debtor's back door.[4] Ex. P-1; Ex. P-5; Tr. at 10; 25.

8. The Debtor attempted (unsuccessfully) to catch Fury; she enlisted her neighbors' help as well. Tr. at 26.

9. Fury, who was wearing neither a collar nor a leash, ran from the Debtor's to the Plaintiff's home and attacked the Plaintiff's two (2) Yorkie Terriers, brother and sister. Ex. P-1; JPS at 1; Tr. at 10. The male Yorkie weighs nine (9) pounds and the female weighed six (6) pounds. Id.

10. Mr. Blum tried to stop the attack by restraining Fury. Tr. at 10.

---

[3] Mr. Blum was scheduled to testify at the trial but did not appear.

[4] This testimony contradicts the Joint Pre-Trial Statement, which states that the dog "broke free from the leash in the Debtor's yard." JPS at 1.

11. The attempted restraint was unsuccessful; Fury first attacked the Yorkie male, causing him to bleed, Tr. at 10, and then attacked the Yorkie female, "shaking [her] like a ragdoll." Tr. at 11.

12. At some point during the attack of the Plaintiff's two (2) dogs, the Debtor arrived at Tepes' house. Tr. at 11.

13. The South Whitehall Township Police were called to the scene. Tr. at 12; Ex. P-1.

14. Following the attack of his two (2) dogs, Tepes took his Yorkies to Valley Central pet hospital, where the male dog was treated for lacerations and the female dog died due to the severity of her spinal injuries. Ex. P-1; Tr. at 11.

15. The bill for the veterinary care of the Yorkies was $11,600.00. Tr. at 11.

16. At the time of the incident, Mr. Blum agreed that he would be responsible for the financial cost of the dogs' injuries.  Ex. P-1.[5]

17. Also on Christmas morning 2019, prior to attacking the Yorkies, Fury attacked the Debtor's neighbor's dog.  Ex. P-5; Tr. at 16-17; 40.

18. The neighbor's dog died due to his injuries.  Tr. at 17.

## The State Court Action

19. On January 23, 2020, the Debtor was charged with two (2) criminal offenses under Pennsylvania's Dog Law: (1) harboring a dangerous dog pursuant to 3 P.S. §459-502-A§§A1(II); and (2) unlawful confinement and control pursuant to 3 P.S. §459-305 §§A3. JPS at 2; Tr. at 29-30.

---

[5] The JPS, however, states that the Debtor agreed to be responsible for all costs related to the incident.  JPS at 1-2.

20. Following a trial held on July 22, 2020, the Debtor was found guilty of both charges and fines in the amount of $13,312.00 were imposed. JPS at 2; Ex. P-2; Tr. at 34.[6]

21. The Debtor was represented by counsel during the state court proceedings. Tr. at 31.

22. After trial, the Debtor was ordered to pay $2,000.00 per month to the Plaintiff to compensate him for the veterinary bills. Tr. at 35.

23. The Debtor appealed the verdict against her in the Court of Common Pleas of Lehigh County on August 3, 2020. JPS at 2; Ex. P-2; Ex. P-4; Tr. at 34-35.

24. During the appeal hearing on November 13, 2020, the parties agreed to a stipulated order. JPS at 2 (the "Settlement Order"). At this time, the more serious charge of harboring a dangerous dog, of which the Defendant was found guilty at trial, was replaced with the lesser charge of unlawful confinement. Ex. P-4 at 3.

25. The Plaintiff considered the Settlement Order to be "a deal" between the parties according to which the Debtor must pay the Plaintiff $1,500.00 immediately (followed by an additional amount) towards the Plaintiff's veterinary bills in exchange for which the Plaintiff would agree to a lesser charge to be filed. Tr. at 18 (quote); 23; 36.

26. The Debtor also considered her consent to pay a certain amount to the Plaintiff (and her signing of the confession of judgment, see Finding of Fact 29 infra) to be an agreement by which the charges against her would be reduced. Tr. at 31; 38.

27. Reduction of the criminal charge was intended to insure that Fury would not be classified as a dangerous dog. Tr. at 23.

---

[6] The Joint Pretrial states the slightly different amount of $13,714.25. JPS at 2.

28. Classification of Fury as a dangerous dog would have resulted in higher fines and the need for an annual inspection by the dog warden, as well as the possibility that Fury would have been euthanized. Tr. at 23; 30.

29. Following the settlement, on December 12, 2020, the Debtor executed the Judgment in the amount of $11,621.75. JPS at 2; Ex. P-3; Tr. at 37.

30. The Judgment specifies that the amount is owed to the Plaintiff "for value received" and that the amount is to be paid within sixty (60) days of execution. Ex. P-3; Ex. P-6. [7]

31. Sentencing of the Defendant was deferred and the Debtor was ordered to pay the Judgment within sixty (60) days. Ex. P-4 at 5; Tr. at 36.

32. The Debtor made one (1) payment of $1,500.00 towards satisfaction of the Judgment; this amount was paid by check on January 5, 2021. JPS at 3; Ex. P-3. The Debtor made no other payments to the Plaintiff. Tr. at 20-21; Tr. at 37.

33. As part of the negotiated plea, on March 22, 2021, the Debtor pled guilty to the second count (failing to control her dog); the first count of the charges was dropped. JPS at 2; Ex. P-4 at 3.

### The Debtor's Bankruptcy and Related Events

34. The Debtor filed for chapter 7 bankruptcy protection on June 16, 2021.

35. The Debtor testified at her §341 meeting of creditors that she "agreed to repay the criminal restitution order in connection with her criminal case and guilty plea." JPS at 3.

36. The Debtor's Schedule E/F lists a debt to Plaintiff in the amount of $13,299.37 for "Confession of Judgment."[8]

---

[7] The Defendant also owes approximately $214.95 in costs and fees to the Court of Common Pleas. Ex. P-4 at 9.

[8] This number is apparently total fines imposed by the magistrate judge rather than the Confession of Judgment amount. JPS at 2.

37. The Debtor's Schedule J lists expenses of $600.00 for restitution payments and $400.00 for pet food and medical expenses for Fury.

### III. DISCUSSION

#### A. 11 U.S.C. §523(a)(7)

As mentioned, two (2) causes of action remain - one pled in the Complaint and one raised at trial. First, I will address the Plaintiff's contention that §523(a)(7) allows him to prevail despite the fact that the Complaint fails to state a claim under this Code section.

##### 1. Procedural Considerations

Section 523(a)(7) provides that a debt is not discharged "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit[9] and is not compensation for actual pecuniary loss . . . ." This provision is limited to payments owed to the government; it does not prohibit discharge of punitive debts owed to individuals. 4 Collier on Bankruptcy ¶523.13 (16th ed.2021).

The Plaintiff, who did not state a cause of action in his Complaint pursuant to 11 U.S.C. §523(a)(7), seeks nonetheless to have this court determine nondischargeability pursuant to this Code provision. The Plaintiff informed the Debtor and the court of his intent to proceed under §523(a)(7) at the trial; notice was not provided.

The Plaintiff argues that a debt that meets the requirement of §523(a)(7) is automatically determined to be nondischargeable without the filing of an adversary complaint, or the imposition of "an evidentiary hearing, notice, or . . . proving of fact." Tr. at 43; 45; see also Tr.

---

[9] The term "governmental unit" means "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or . . . ." 11 U.S.C. §101(a)(27).

7

at 5. The assertion, in other words, is that certain debts escape the imposition of discharge without any procedural safeguards. Tr. at 54 (causes of action pursuant to 11 U.S.C. §§ (a)(7) and (a)(13) "don't require notice, and a hearing, and a determination by the judge. They just are").

The law supports the opposite conclusion.

A proceeding to determine the dischargeability of a debt must be commenced by the filing of an adversary proceeding, see F.R.B.P. 7001(6), which begins with issuing a complaint. F.R.B.P. 7003. Kuenstler v. Half Price Books, Recs., Magazine, Inc., 589 B.R. 138, 144 (E.D. Tex. 2018); In re Luckman, 2012 WL 6708586, at *9 (Bankr. D. Mont. Dec. 26, 2012).

It is true, as Tepes points out, that 11 U.S.C. §523(c)(1) segregates and applies a stricter standard to the determination of nondischargeability actions under sections 523(a)(2), (a)(4), and (a)(6) (actions that require a showing of intent). See Tr. at 5; 51. This more stringent standard does not, however, indicate that only these three (3) §523(a) actions require the filing of an adversary proceeding – a reading that would explicitly contradict Bankruptcy Rule 7001. Rather, §523(c)(1) means that only the relief allowed by §§523(a)(2), (a)(4), and (a)(6) can be provided *exclusively by the Bankruptcy court during the bankruptcy process*, 10 Collier on Bankruptcy ¶ 7001.07 (16th ed. 2022), whereas jurisdiction under nondischargeability provisions other that subsections under §§523(a)(2), (4) and (6) "may be exercised by either the bankruptcy court or a state or other nonbankruptcy court," Id. see also 9 Collier on Bankruptcy ¶ 4007.04 (16th ed. 2022) ("unlike other dischargeability issues which may be raised at any time under Rule 4007(b), these issues must be raised by a creditor before the deadline expires; otherwise they are forever lost to the creditor."); In re Galbreath, 83 B.R. 549, 551 (Bankr. S.D. Ill. 1988) ("a creditor with a type of debt listed as nondischargeable under [§523(a)(7)] as opposed to

§§523(a)(2), (a)(4), or (a)(6)] may wait until the conclusion of the bankruptcy proceeding and then bring suit on its claim in the appropriate nonbankruptcy forum.").

The Plaintiff relies on <u>Kelly v. Robinson</u>, 479 U.S. 36 (1986), a Supreme Court Opinion which holds that a restitution payment owed by the Debtor to the state of Connecticut was not dischargeable pursuant to §523(a)(7) even though the amount due to the state would ultimately be paid to the victim of the crime. The Plaintiff, in asserting that <u>Kelly</u> is on all fours with this case, incorrectly states that relief was granted "without an adversary proceeding." Pl.'s Br. at 1. But the Debtor in <u>Kelly</u> did, in fact, file a post-discharge adversary proceeding on which the Bankruptcy Court held trial. Notice and an opportunity for the opposing party to be heard were provided.

The Plaintiff's further contention that "the Court examined the <u>automatic</u> nondischargeability of criminal restitution without an adversary proceeding," <u>Id.</u> at 1 (emphasis in original), finds its bearing in the text. However, while the Supreme Court does describe the nondischargeability of the restitution payment as "automatic," <u>Kelly</u>, 479 U.S. at 42 and n.4 (1986), a complete reading of the Opinion makes clear that the Court uses this language to distinguish debts deemed nondischargeable under §523(a)(7) from those under §§523(a)(2),(4) and (6) (which, as discussed, require additional procedural safeguards). In other words, qualifying restitution and fines under §523(a)(7) may be "protected from discharge." <u>Id</u>. at 43. The Court did not discuss the procedural requirements for obtaining a determination that the debt is not discharged, but the facts of the case make clear that the Debtor sought relief (which was ultimately denied) by filing a post-petition adversary proceeding. Thus, the word "automatic" in

Kelly refers to the *effect* of the Bankruptcy Court discharge on *certain debts*, not, as Plaintiff contends, a spontaneous legal determination regarding a creditor's rights or lack thereof.[10]

Before turning to the substantive considerations in analyzing a §523(a)(7) cause of action, I pause to note that the Plaintiff's position is not internally consistent. Tepes insists that relief may be granted pursuant to §523(a)(7) without the benefit of the filing and notice of a pleading advising the Debtor of the relief he seeks,[11] yet at the same time asks this court to make a determination. If the relief is automatic, then why present testimony and evidence and file a post-trial brief? If the relief is not automatic, but rather requires findings and deliberation, then why not give the Defendant notice and an opportunity to be heard? Further, the Plaintiff's presentation of facts and argument at and following trial implicitly recognizes that legal hurdles must be met in order for a determination of nondischargeability to be made by a Bankruptcy Court. In sum, relief may not be granted as a matter of right without a trial on the merits.

### 2. Substantive Considerations

While the procedural defects with regard to the Plaintiff's §523(a)(7) cause of action are determinative, I find, in the alternative, that the debt owed to the Plaintiff does not meet the statutory requirements. For a debt to be determined non-dischargeable pursuant to §523(a)(7),

---

[10] Nor does In re Gi Nam, 273 F.3d 281 (3d Cir. 2001) (the Third Circuit case overruling the case cited in Debtor's brief) help. In Nam, the Third Circuit held that a bail bond forfeiture judgment is nondischargeable pursuant to §523(a)(7) (interpreting Kelly to read §523(a)(7) broadly to include penal sanctions not specified in the statute and distinguishing Kelly as discussing a penalty, not a forfeiture).

I note further that in Nam, an adversary proceeding was filed in the Bankruptcy Court and that there was no question that the debt was owed to a governmental organization (the City of Philadelphia) – two (2) factors not present in our case.

[11] See In re Boni, 240 B.R. 381, 386 (B.A.P. 9th Cir. 1999) (noting the "difficulties that are apt to arise if the bankruptcy court too easily permits parties to circumvent the rules governing adversary proceedings"; Kuenstler v. Half Price Books, Recs., Mags., Inc., 589 B.R. 138, 143 (E.D. Tex. 2018) ("Due process in the bankruptcy context requires that individual notice be given before rights can be affected.").

three (3) requirements must be satisfied: the debt (1) must be for a fine, penalty or forfeiture; (2) payable to and for the benefit of a governmental unit; and (3) may not be compensation for actual pecuniary loss. 11 U.S.C. §523(a)(7); In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006).

Here, none of these elements has been satisfied. First, although there is legal authority to support the notion that restitution is in the class of penalties excepted from discharge, see In re Thompson, 418 F.3d 362, 366 (3d Cir. 2005) (holding that a criminal restitution payment was nondischargeable even though the money was for the benefit of victims), we do not have sufficient evidence that the debt to Tepes can be classified as restitution. As discussed below, the Judgment specifies that the amount owed to Plaintiff is for "value received," rather than as a court imposed penalty. Ex. P-3. Plaintiff's reliance on the Debtor's occasional reference to the debt as "restitution," Tr. at 41-42; Ex. P-7, does not meet this burden, particularly where counsel for the Plaintiff acknowledged that the Debtor received value in exchange for the debt. Tr. at 51-53.

Second, there is no question that the debt is payable to an individual (Tepes) rather than "to and for the benefit of a governmental unit." §523(a)(7); Hughes v. Sanders, 469 F.3d 475, 478 (6th Cir. 2006) (plain language of statute indicates that debt must be to a governmental unit.) See Finding of Fact 24 (Debtor ordered to pay Plaintiff); F.F. 27 (Plaintiff considered the settlement to be a "deal" between the parties); F.F.28; F.F. 32 (Confession of Judgment is amount owed to Plaintiff); F.F. 39 (same).[12]

---

[12]    One could argue that Thompson, by noting that Kelly did not suggest that "payable to and for the benefit of a governmental unit language is actually limited to government victims," calls into question the second prong of the §523(a)(7) test. 418 F.3d at 366. However, Thompson did not hold that payments made directly to victims may qualify as restitution for purposes of §523(a)(7), nor has the case been so interpreted. Further, Thompson states that generally – and unlike here – restitution is not correlated with the victim's injury but rather is payment that addresses the interests of the state. Id. at 365. Lastly, I note

Third, the evidence indicates that the debt to the Plaintiff is for an actual pecuniary loss, making the sum ineligible for §523(a)(7) relief. Recently, the Seventh Circuit, in analyzing a §523(a)(7) nondischargeability issue, defined pecuniary loss as "the disappearance or diminution of something having monetary value resulting from the real and substantial destruction of property, which usually occurs in an unexpected or relatively unpredictable way and often because of another's misconduct." Osicka v. Off. of Law. Regul., 25 F.4th 501, 507 (7th Cir. 2022). See also In re Buono, 2020 WL 5760424, at *6 (D.N.J. Sept. 28, 2020) ("The term 'actual pecuniary loss' clearly connotes measurable damages from particular instances of wrongdoing.") (citation omitted). The Judgment owed by the Debtor to the Plaintiff was meant to compensate for veterinary costs incurred as a result of the attack by Fury, see F.F. 19, 24, 27; Tr. at 52 (counsel for Plaintiff acknowledging that the debt is "to repay for the vet bill") and therefore is a debt for a loss to an individual, which is dischargeable under the Code.

For all these reasons, Plaintiff's §523(a)(7) allegation must fail.

### B. 11 U.S.C. §523(a)(6)

Tepes' cause of action pursuant to 11 U.S.C. §523(a)(6) is a closer call. In essence, the Plaintiff argues that the debt to him should not be dischargeable because the Debtor failed to control her dog, who she knew to be violent. Tr. at 54.

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6).

As Judge Frank of this court recently summarized:

---

that the restitution in Thompson, although for the benefit of victims of the Debtor's crimes, was payable to the Cape May Probation Department, a governmental unit. Id. at 364.

to prevail, the plaintiff must establish three (3) elements demonstrating that the debt arose from an injury that was:

(1) willful (i.e., involving deliberate and intentional conduct);
(2) intended or substantially certain to cause injury; and
(3) malicious (i.e., wrongful).

In re Lauer, 2022 WL 174173, at *3 (Bankr. E.D. Pa. Jan. 19, 2022) (quoting In re Tzabari, 622 B.R. 332, 341-42 (Bankr. E.D. Pa. 2020)); In re Dietrich, 595 B.R. 59, 65 (Bankr. E.D. Pa. 2018) ("deliberate actions that are substantially certain to produce injury are willful within the meaning of § 523(a)(6)"); See also In re Pfender, 2022 WL 696947, at *10 (Bankr. E.D. Pa. Mar. 8, 2022) ("Malicious injury requires (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse") (citation omitted).

In order to meet the burden under §523(a)(6), a creditor does not need to show that the debtor had a specific intent to cause injury to another. Rather, a debtor's actions are willful and malicious within the meaning of §523(a)(6) where those actions are "substantially certain to result in injury . . . an act done intentionally which necessarily produces harm . . . or . . . is substantially certain to produce harm . . . constitutes willfully inflicted injury. . . ." In re Conte, 33 F.3d 303, 308–09 (3d Cir. 1994).

An inquiry into whether death or harm caused by a debtor's dog is willful and malicious is fact intensive; courts have come out both ways. Compare In re Cardoza, 615 B.R. 901, 910 (Bankr. D.N.M. 2020) (finding that injury sustained by debtors' neighbor due to vicious dog was not "willful and malicious" per §523(a)(6), where the debtors were not shown to have reason to believe that their dog was a danger) and Matter of Quezada, 718 F.2d 121, 123 (5th Cir. 1983) (debt for injury caused by dog known to have bitten a child previously was not within discharge exception of §523(a)(6) because the debtor's conduct was "not shown to be conduct intentionally

13

exposing others to harm by the vicious dog."); with In re Lababit, 2009 WL 7751426 (B.A.P. 9th Cir. Oct. 8, 2009) (upholding determination that the killing of neighbor's cat by debtor's dog was "willful and malicious" because, in part, the debtor had knowledge that the dog had previously killed a cat) and In re Frye, 2020 WL 7238269, at *4 (Bankr. N.D.W. Va. Dec. 8, 2020) (denying a motion to dismiss and noting that "the facts [that the dog had previously exhibited vicious behavior] also seem to indicate that that the debtors' actions were beyond mere negligence"). Accordingly, our case presents a factual issue with regard to the Debtor's state of mind.

But before analyzing the issue of the Debtor's intent, I find that the second and third elements necessary to prove liability pursuant to §523(a)(6) — the showing of a wrongful act that is substantially certain to cause injury — are satisfied. The evidence presented allows a conclusion that the Debtor's dog is dangerous. Fury escaped from the Debtor's home by "charg[ing]" the Debtor. Tr. at 25; Ex. P-5. The dog ran through the neighborhood, first killing another neighbor's dog. After running free and fast, Fury was placed in a headlock by Mr. Blum (perhaps the only way of restraining her and presumably because Fury showed signs of aggression) and then proceeded to break free from that constraint also. Tr. at 10. Fury attacked Tepes' two (2) dogs not from fear or self-defense, but by chasing them down and shaking them violently. Tr. at 11. Whatever the Debtor's prior knowledge or intent that Christmas morning, there is little question that failing to restrain Fury was a wrongful act that was substantially certain to – and did - cause injury.

The issue here thus boils down to the first prong of the Tzabari test: was the Debtor's action — or inaction — deliberate and intentional? Does the Debtor's conduct amount to willfulness? The law cited above demonstrates that a determination of an animal owner's culpability rests primarily on whether the individual had prior knowledge of the pet's propensity

14

for aggressive behavior or some reason to believe that the animal may become violent. Thus, in order to prevail, Tepes needed to offer facts at trial that demonstrate that at the time that Fury attacked the Plaintiff's Yorkies, the Debtor either knew her dog was vicious or had reason to believe that Fury would attack. Such facts would reveal the Debtor's relevant state of mind.

The Plaintiff failed to make this showing.

We do know that on the morning of the incident, Fury attacked and killed another neighbor's dog. See F.F. 17, 18. However the Plaintiff provided no evidence that the Debtor had knowledge of this prior attack at the time of the incident in question.

Rather, the Plaintiff asks us to infer the Debtor's malice. Counsel for the Plaintiff summarized as follows:

> [I]t was my understanding that [Fury] had attacked other dogs. Ms. Sage's testimony today was that there was no propensity for violence shown by this dog . . . all I can say is that I don't believe that testimony. . . I've been a dog owner my entire life . . . dogs, I don't think, just break out one day and kill all the other dogs in the neighborhood. You have to know there's an issue if you've owned a dog for five years. Tr. at 52-54.

The argument has some common sense appeal. It seems unlikely that in the seven (7) years[13] prior to the Christmas day attack the Debtor knew Fury to be a harmless animal who, as she testified, just "licks [and] nudges" her soft toys. Tr. at 28; see also Tr. at 40. Pet ownership and life experience teaches that dogs, like other animals, have personalities and character tendencies; some are simply more aggressive than others. Thus, I frankly doubt that Fury suddenly and spontaneously became dangerous one day nearly a decade into her life.[14]

---

[13] The Debtor testified that she's owned the dog since Fury was a puppy, seven (7) years. Tr. at 27. This statement is in conflict with the Plaintiff's contention that the Debtor has owned the dog for five (5) years. Tr. at 52.

[14] Consequently, I question the Debtor's credibility in testifying that the attacks came as a complete surprise to her. And the Debtor's explanation that Fury grabbed the Plaintiff's two (2) Yorkies by their necks because she thought they were her fluffy toys is incredible.

However, I cannot make a determination in this case based on personal experience and common sense. The thin evidence presented is consistent with the Debtor's - improbable as it may be - assertion that she had no reason to believe that Fury had violent tendencies.[15] While direct evidence that the Debtor knew that Fury killed another dog and failed to restrain Fury may be difficult to obtain, evidence of Fury's training (or lack thereof), socialization (or lack thereof), and or aggressive past behavior would have been helpful in making a finding with regard to the dog's history and the Debtor's corresponding culpability.[16] In the absence of any such evidence, I must make a determination based on the Plaintiff's failure to meet his burden of proof.

### IV. CONCLUSION

This is not an easy case.

For the reasons discussed, the debt to Tepes will be discharged due to the fact that the Plaintiff has not satisfactorily presented a cause of action under §523(a)(6) or §523(a)(7).

My finding in favor of the dischargeability of the debt, however, is not an indication that the Plaintiff wasn't harmed. To the contrary, through no fault of his own, Tepes suffered an enormous loss, both emotionally and financially, when his dogs were attacked and he was forced to incur a large veterinary bill. He will not be compensated for this loss. Nor is the Debtor, who finds herself the subject of criminal prosecution for the behavior of her pet as well as the

---

But the inconsistencies with the Debtor's testimony were not explored at trial. And while I can discount the Debtor's self-serving testimony, the Plaintiff has not provided sufficient evidence to support a contrary conclusion.

[15] Although the Debtor's intent is *the* critical issue with regard to a finding of nondischargeability under §523(a)(6), Plaintiff's counsel asked the Debtor only four (4) questions at trial with regard to her knowledge of Fury's past behavior.

[16] Further, Mr. Blum, who witnessed the attack and placed Fury in a headlock, did not testify at trial.

Defendant in a bankruptcy trial, a victor. The disposition of this adversary should not be read to discount or minimize either position.

|  |  |
|---|---|
| **Date:** June 15, 2022 | */Patricia M. Mayer/*<br>_____<br>**PATRICIA M. MAYER**<br>**U.S. BANKRUPTCY JUDGE** |